1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8
9
10

DAVID SCHLOSSER,

Petitioner,

CASE NO. 2:22-CV-1112-RJB-DWC

11

v.

REPORT AND RECOMMENDATION

12

Noting Date: June 2, 2023

13

MELISSA ANDREWJESKI,

14

Respondent.

15
16

The District Court has referred this action to United States Magistrate Judge David W.

17 Christel. Petitioner David Schlosser filed his federal habeas petition, pursuant to 28 U.S.C. §

18 2254, seeking relief from his state court convictions and sentence. *See* Dkt. 3. Petitioner has also

19 filed an unopposed motion to withdraw Grounds 3, 5 and 6 (Dkt. 25), which the Court

20 recommends be granted. After review of the relevant record, the Court concludes the state

21 court's adjudication of petitioner's remaining claims (Grounds 1, 2 and 4) was not contrary to,

22 nor an unreasonable application of, clearly established federal law. The Court finds an

23 evidentiary hearing is not necessary. The Court recommends Grounds 3, 5 and 6 of the petition

24

1   be dismissed, and Grounds 1, 2 and 4 be denied; the Court further recommends a certificate of

2   appealability not be issued.

3   **I.    Background**

4         A.    <u>Factual Background</u>

5         The Court of Appeals of the State of Washington ("state court of appeals") summarized

6   the facts of petitioner's case as follows:

> Stephanie is the mother of A.D., born in . . . 2003. [footnote omitted] Schlosser and
> Stephanie began dating when A.D. was about a year old and married in 2007. They
> had two children together, I.S. and L.S. The family dynamic was tumultuous,
> marked by instances of physical abuse, domestic violence, and multiple contacts
> with Child Protective Services (CPS). Stephanie said that Schlosser was the
> "primary disciplinarian" for the children and "very harsh" on A.D., including
> "hitting and kicking her." When Stephanie tried to intervene, Schlosser told her she
> "didn't know what good parenting was."
>
> A.D. said that for as long as she could remember, Schlosser "didn't really like me,
> and wasn't very nice to me." At first, he "just" yelled at her, called her names like
> "moron," or "ma[d]e fun of how" she looked. If she cried, he locked her in the
> garage with the lights off. After the age of five, the "discipline increase[d]" and
> became "more violent," including shoving her, pinning her against the wall, sitting
> on top of her, slapping her in the face, and punching her all over her body. Schlosser
> also used a belt or wet towel to hit A.D. "a few times a week." A.D. said that "[i]t
> felt like everything I did kind of like he would get mad at me about just the smallest
> things."
>
> According to A.D., at some point in 2009 when she was about six years old,
> Schlosser began "weird[ly]" rubbing her buttocks with his hands, and then things
> "kind of like escalated." She recalled an instance when Schlosser "got mad" at her,
> "pinned [her] against the wall," then "reached down [her] pants" and "touched [her]
> vagina." A.D. said that "a touch like that" started "just occasionally," then it
> escalated to "once or twice a week." A.D. never told Stephanie about Schlosser
> inappropriately touching her because she was "scared" of what would happen if she
> did, especially getting "wors[e] punishment or more punishment."
>
> A.D. also described a 2011 incident after the family moved from an apartment to a
> three-level house in Issaquah. Schlosser walked into the bathroom while she was
> bathing and digitally penetrated her vagina. Schlosser had not touched her like that
> before. A.D. said Schlosser "told me not to tell my mom."
>
> One night in March 2013, A.D. walked upstairs from her first-floor bedroom as she
> had done many times before. She was crying and wanted to sleep on the third floor

of the house with "everybody else." A.D. described Schlosser "screaming at me to shut up, and go back to my room." When she did not immediately leave, Schlosser grabbed A.D.'s arm "hard," walked her down to her room, and "told [her] to pull off [her] pants." A.D. was on the ground on her hands and knees. A.D. said Schlosser "started whipping me with the belt like he would do." And then he raped her for about 10 minutes. When A.D. used the bathroom later that night, "it hurt" and she noticed she was bleeding from her vaginal area. Because A.D. "was scared," she did not tell Stephanie.

The next day, A.D. took a bath and "started bleeding again." A.D. wanted her mother to look at the injury and "make sure that [she] was okay," so A.D. told Stephanie that "I had fallen down the stairs, and that I hurt myself." A.D. stated that she could not tell Stephanie "what actually happened" because Schlosser "would get in trouble," and she was "worried about ... everybody in my house ... being safe." Stephanie then took A.D. to see pediatrician Dr. Laurie Diem. A.D. also told Dr. Diem that she fell down the stairs.

Dr. Diem observed a laceration and bruising in A.D.'s vaginal area, noticed no other injuries on A.D.'s body, and believed falling down the stairs conflicted with A.D.'s injuries. She then reviewed A.D.'s "whole medical history" and "saw several previous emergency room visits for fractures" and "broken bones." The number of A.D.'s injuries "was another red flag" in Dr. Diem's opinion. Because of suspicions of sexual abuse, Dr. Diem reported the injuries to CPS.

Days later, A.D. underwent another examination with pediatrician and child abuse specialist Dr. Rebecca Wiester. Dr. Wiester concluded that the vaginal laceration injury she observed reflected a "straddle injury." Dr. Wiester believed that A.D.'s injuries "can be accidental," including "an awkward fall," with "no other visible signs of injury." A.D. did not tell either doctor that Schlosser sexually assaulted her.

Within a month of the rape in A.D.'s bedroom, Schlosser told A.D. to join him in the master bedroom so they could watch television together, which he had done before. The two were home alone. After A.D. lay on the bed, Schlosser raped her. Schlosser told her that "this is what dads and daughters do."

In the two months that followed, life was "[a]wful" for Stephanie. Schlosser "was berating [her] everyday" and "treat[ing] [A.D.] horribly" because "[n]othing was ever good enough." Schlosser and Stephanie separated in June 2013 and she moved out of the house. They completed their divorce in February 2016. At first, they shared custody of the three children. But soon, A.D. "wanted nothing to do with that" and stopped seeing Schlosser entirely.

In October 2016, A.D.'s boyfriend C.F. approached her about having sexual intercourse. A.D. text messaged C.F. that she did not want to have sex with him because Schlosser had raped her "more times than [she] could count." That same

month, A.D. had a text message conversation with her best friend J.B. about why she broke up with C.F. She eventually told J.B. that she "was raped" but did not tell J.B. who did it. J.B. guessed "it was Dave," and A.D. admitted Schlosser had raped her "multiple times."

J.B. was "very upset" and told her mother Deb. Deb then called A.D.'s grandmother Jillian and told her about the rapes. Jillian told her counselor about Deb's call, who then made a mandatory report to CPS. The next day, Jillian told A.D. that she knew Schlosser had sexually abused her, [footnote omitted.] and A.D. started to cry. A.D. admitted that Schlosser sexually assaulted her and later told Stephanie too.

The police and CPS interviewed A.D. and several family members and friends. At first, A.D. disclosed only the 2013 rape in the master bedroom. Eventually, she disclosed that before raping her, Schlosser had repeatedly grabbed her buttocks and vagina for years. Dr. Wiester also met with A.D. again after her 2016 disclosure. During the second interview, A.D. told Dr. Wiester that Schlosser raped her one time.

In November 2016, the State charged Schlosser with rape of a child in the first degree (count 1) and child molestation in the first degree (count 2) for sexually assaulting A.D. from 2011 to 2013 when she was between the ages of 8 and 10 years old. Schlosser pleaded not guilty. After more interviews, A.D. disclosed the 2009 incident in the bathtub and the 2013 rape in her bedroom. The State added another count of rape of a child in the first degree (count 3) and amended the charging period on all counts from 2009 to 2013 when A.D. was between 6 and 10 years old.

During pretrial discovery, Schlosser issued a notice of intent to subpoena A.D.'s mental health counseling records from licensed mental health counselor Laura Franco. [footnote omitted] Schlosser specifically sought "[a]ny and all records related to A.D." and "any other written reports which contain any of the following":

a.    Any reference to the defendant David Schlosser, [REDACTED], as well as any reference to [REDACTED];

b.    Any reference to statements made by A.D. describing any alleged acts of abuse of A.D. by David Schlosser; and

c.    Any reference to any other statements made by A.D. about David Schlosser; and

d.    Any reference to any times A.D. has been dishonest or has lied to anybody; and

e.    Any reference to I.S. or L.S.; and

f.    Any reference to any conversations A.D. had with anybody else about abuse; and

g.    Any reference to any conversations A.D. had with anybody about sex and boundary issues; and

1    h.    Any reference to any allegations of inappropriate behaviors or abuses
2          committed against A.D. by anyone other than David Schlosser. [footnote
          omitted]

3    A.D. moved for a protective order, arguing that Schlosser lacked a "sufficient
4    'factual predicate'" for the records and that "[t]he notices contain categorical,
     generalized descriptions of records which could apply to any case and are
     essentially dragnets trolling for any mention of enumerated key words."
5
6    Schlosser responded, saying he "believes" the counseling records "will likely have
     references" to reported CPS incidents, will "possibly" reference "additional
     incidents in which A.D. believes" he "abused or neglected" her, and will "contain
7    evidence of A.D.'s bias against" him. Schlosser also believed that A.D. "never
     mentioned the allegations of sexual abuse at issue in this case prior to the fall of
8    2016 to anybody, including Ms. Franco, to whom she reported other alleged
     abuses." Schlosser acknowledged, "Obviously, defense counsel cannot prove that
9    these records contain evidence of A.D.'s bias against [him]," which is why he asked
     to "review them or, at the very least, for the Court to review them in camera."
10
11   After considering the pleadings and oral argument, the trial court issued an order
     granting A.D.'s motion for a protective order as to her counseling records, denying
12   Schlosser's motion for in camera review, and quashing the subpoena for those
     records. During consideration of the parties' motions in limine, the court expanded
13   its ruling to prohibit any questioning of A.D. about whether she told Franco of the
     sexual assaults.

14   The case proceeded to jury trial in November 2018. Several witnesses testified,
     including A.D., Stephanie, Jillian, C.F., J.B., Dr. Diem, Dr. Wiester, a child
15   interview specialist, three Issaquah Police Department detectives, and Schlosser.
     Schlosser testified he never had sexual intercourse with A.D., never walked into the
16   bathroom while she was bathing, never invited her to watch television in his bed,
     never called her names, never struck her out of anger, and never grabbed her
17   buttocks or vagina.

18   In closing, defense counsel emphasized Schlosser's theory that A.D. was not
     credible, that her claims "are unreasonable," and that A.D.'s testimony "can't
19   possibly amount to proof beyond a reasonable doubt." Counsel highlighted
     inconsistent statements A.D. gave to several friends, relatives, law enforcement,
20   and medical professionals about the number of times Schlosser raped her. Counsel
     then argued, "[T]he most important thing you need to remember about [A.D.] is
21   that she had no hesitation lying to all these different people about what had
     happened."
22
23   The jury found Schlosser guilty of rape of a child in the first degree as charged in
     count 3 but could not reach a verdict on the remaining charges. The trial court
     declared the jury deadlocked as to the charges in counts 1 and 2, ordered a mistrial
24

1

2

3

on those two charges, and granted the State's motion to dismiss those counts. Schlosser then moved for a new trial, claiming the trial judge made an improper comment on the evidence when the judge "admonished defense counsel" in front of the jury and "instructed him not to discuss Mr. Schlosser's testimony during a court recess." The court denied Schlosser's motion.

4

5

6

At sentencing, the trial court imposed an indeterminate sentence within the standard range, lifetime community custody, a lifetime no-contact order with A.D. and "[a]ny minors without supervision," and several crime-related conditions of community custody.

7

Dkt 10-1 at 17–24 (Ex. 2, Unpublished Opinion, Court of Appeals Cause No. 79723-9-I).

8

B.    Procedural Background

9

1. *State Court of Appeals*

10

The King County Superior Court ("trial court") entered petitioner's Judgment and

11

Sentence on March 15, 2019. Dkt. 10-1 at 2–15 (Ex. 1). Petitioner challenged his trial court

12

judgment and sentence on direct appeal. *Id*. at 17–24 (Ex. 3). Of the issues petitioner raised

13

before the state court of appeals, the following are relevant to his federal habeas petition: (1) the

14

trial court abused its discretion and denied due process when it refused an *in camera* review of

15

the A.D.'s counseling records[1]; (2) the trial court violated petitioner's due process rights when it

16

forbade cross-examining the A.D. regarding her failure to tell her counselor petitioner had

17

sexually assaulted her; (3) the trial court made unconstitutional comments on the evidence in an

18

admonishment of defense counsel; (4) the trial court denied petitioner his right to counsel by

19

repeatedly cutting off, interrupting, and rebuking defense counsel; (5) the trial court denied

20

petitioner due process by failing to preserve a record of the jury questionnaire; (6) the trial court

21

erred by denying peititioner's motion for new trial. *Id*. at 55 (Ex. 3). The state court of appeals

22

23

24

_____

[1] Petitioner filed supplemental assignments of error asserting the denial of counseling records and testimony violated the United States Constitution. Dkt. 10-1 at 223–24  (Ex. 6).

1  affirmed petitioner's judgment and sentence, but remanded for clarification of a community

2  custody condition. *Id*. at 17–24 (Ex. 2).

3        Petitioner sought discretionary review by the Washington State Supreme Court ("state

4  supreme court"). *Id*. at 304–375 (Exhibit 11). Petitioner raised the following issues relevant to

5  this petition: (1) the trial court's refusal to conduct an *in camera* review of the victim's

6  counseling records violated petitioner's rights of confrontation, compulsory process and to

7  present a defense; (2) the trial court's prohibition of cross-examination of the victim and her

8  counselor violated petitioner's rights to due process, confrontation and to present a defense; (3)

9  the trial judge commented on the evidence in violation of the Washington Constitution; and (4)

10 the trial court's interruptions and rebukes of defense counsel denied petitioner his right to

11 counsel. *Id*. at 312.  On August 11, 2021, the state supreme court denied petitioner's petition for

12 review without comment. *Id*. at 378 (Exhibit 12). The state court of appeals issued its mandate

13 on September 21, 2021. *Id*. at 380 (Exhibit 13).

14       Petitioner did not file a personal restraint petition ("PRP") or other collateral attack on his

15 judgment and sentence. Dkt. 3 at 3.

16              2.  *Federal Petition*

17       On August 8, 2022, petitioner filed his petition in this matter. Dkts. 1, 3. The petition

18 raises the following grounds for relief:

19      1. The trial court abused its discretion and denied appellant due process when it
           refused in camera review of A.D.'s counselling records. Due process and the
20         rules of discovery entitled appellant to have the court review counseling
           records in camera.
21
        2. The trial court violated appellant's right to confrontation when it forbade
22         cross-examining A.D. regarding her failure to tell her counselor appellant
           sexually assaulted her. The constitutional right of confrontation entitled the
23         defense to cross-examine A.D. about not telling her counselor about sexual
           abuse.
24

3.  The trial court made unconstitutional comments on the evidence. The trial court unconstitutionally commented on the evidence when it accused defense counsel of intending to coach the defendant's testimony.

4.  The trial court denied petitioner his right to counsel by repeatedly cutting off, interrupting, and rebuking defense counsel. The trial court's repeated interruptions, interjections, and sustaining of objections without a stated basis denied appellant his right to effective assistance of counsel.

5.  The trial court denied petitioner due process and his constitutional right to appeal and to a jury because it failed to preserve a record of the jury's questionnaire answer and of jury selection adequate for appellate review.

6.  The court erred by denying appellant's motion for a new trial.

Dkt. 3 at 18–20.

On October 10, 2022, respondent filed an Answer and the relevant state court record, asserting three of petitioner's claims were unexhausted and procedurally barred and the remaining claims failed on the merits. Dkts. 9, 10. Petitioner brought a motion for stay and abeyance, asserting he was seeking to exhaust his state court remedies. Dkt. 13. Respondent opposed the motion, arguing no state court proceedings were pending and, in any event any attempt to pursue state court remedies would be procedurally barred. Dkt. 14. The undersigned recommended denial of a stay (Dkt. 19) which the District Judge adopted (Dkt. 20). On February 16, 2023, after receiving several extensions, petitioner filed his reply. Dkt. 23.

On March 23, 2023, the Court directed Respondent to show cause why the petition is not a "mixed petition" and directed Respondent to brief the merits of Grounds 3, 5, and 6 of the Petition. Dkt. 24. Petitioner filed an unopposed motion to withdraw Grounds 3, 5, and 6 on April 21, 2023. Dkt. 25; *see also* Dkt. 26 (Respondent's response). Based on Petitioner's motion, the Court found the supplemental briefing requested on March 23, 2023 was no longer necessary and the deadlines to file supplemental briefing were stricken. Dkt. 27. As a result, this case became ready for a decision on April 21, 2023.

## II.    Discussion

Respondent maintains: (1) petitioner failed to properly exhaust Grounds 3, 5 and 6 are and they are now procedurally barred; and (2) the state court's adjudication of Grounds 1, 2 and 4 was not contrary to, or an unreasonable application of, clearly established federal law. Dkt. 9.

### A.    Petitioner's Unopposed Motion to Withdraw Grounds 3, 5 and 6

In its Order to Show Cause, the Court noted three of petitioner's claims (Grounds 3, 5 and 6) appeared to be unexhausted but were potentially not procedurally defaulted, thus raising the question whether the petition was a mixed petition. Dkt. 24. Petitioner acknowledged the claims were not exhausted and brought a motion to withdraw them, which respondent does not oppose. Dkts. 25, 26. The Court therefore recommends plaintiff's motion to withdraw Grounds 3, 5 and 6 be granted and the claims dismissed.

### B.    Merits Review (Grounds 1, 2 and 4)

Respondent maintains the state courts' adjudication of Grounds 1, 2 and 4—the remaining grounds raised in the petition—was not contrary to, or an unreasonable application of, clearly established federal law. Dkt. 9.

#### 1. *Standard of Review*

Pursuant to 28 U.S.C. § 2254(d)(1), a federal court may not grant habeas relief on the basis of a claim adjudicated on the merits in state court unless the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." In interpreting this portion of the federal habeas rules, the Supreme Court has ruled a state decision is "contrary to" clearly established Supreme Court precedent if the state court either (1) arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) confronts facts

"materially indistinguishable" from relevant Supreme Court precedent and arrives at an opposite result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Moreover, under § 2254(d)(1), "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411; *see Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). An unreasonable application of Supreme Court precedent occurs "if the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407. In addition, a state court decision involves an unreasonable application of Supreme Court precedent "'if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Williams*, 529 U.S. at 407).

The Anti-Terrorism Effective Death Penalty Act ("AEDPA") requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Further, review of state court decisions under §2254(d)(1) is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180–81 (2011).

### 2. *Denial of in Camera Review of Counseling Records (Ground 1)*

In Ground 1 of the petition, petitioner alleges the trial court erred when it declined to require a third party to produce counselling records of the minor victim, A.D., for *in camera* review. Dkt. 3 at 18. Petitioner contends the records "were likely to contain outright denials of sexual abuse by Schlosser" and would establish A.D. "never asserted she was raped or molested

1    by Schlosser." Dkt. 23 at 15. Respondent argues the state court reasonably denied petitioner's

2    claim because petitioner did not show the records were relevant and material. Dkt. 9 at 19–22.

3          The Supreme Court addressed the constitutional standard for determining when due

4    process entitles a criminal defendant to an *in camera* review and disclosure of privileged third-

5    party records—like those sought be petitioner here—in *Pennsylvania v. Ritchie*, 480 U.S. 39

6    (1987). *Ritchie* confirmed a criminal defendant is not constitutionally entitled to disclosure of

7    privileged records just because they might contain relevant information. At the same time, the

8    Court recognized the strong public interest in protecting sensitive information such as the

9    counseling or mental health records of complaining witnesses does not necessarily prevent

10    disclosure in all circumstances. The Court held that "the ability to question adverse witnesses . . .

11    does not include the power to require the pretrial disclosure of any and all information that might

12    be useful in contradicting unfavorable testimony." *Id*. at 53. Nevertheless, "the government has

13    the obligation to turn over evidence in its possession that is both favorable to the accused and

14    material to guilt or punishment." *Id*. at 57. Under this standard, "evidence is material only if

15    there is a reasonable probability that, had the evidence been disclosed to the defense, the result of

16    the proceeding would have been different." *Id*. A "'reasonable probability' is a probability

17    sufficient to undermine confidence in the outcome." *Id*. (internal citations omitted).

18          While the Ninth Circuit does not appear to have articulated the parameters of *Ritchie*, the

19    Sixth and Seventh Circuits agree that a defendant seeking *in camera* review must "establish a

20    basis for his claim that it contains material evidence" by making "some plausible showing that

21    the evidence sought would have been both material and favorable to the defense." *Renusch v.*

22    *Berghuis*, 75 F. App'x. 415, 424 (6th Cir. 2003); *Dietrich v. Smith*, 701 F.3d 1192, 1197 (7th Cir.

23    2012) (agreeing with the articulation of the *Richie* standard in *Renusch*). *See also Craig v.*

24

1  *Ducart*, No. 3:16-cv-02531-GPC-KSC, 2019 WL 2868939 (S.D. Cal. July 3, 2019) (following

2  *Renusch* and *Dietrich*).

3      The state court of appeals, citing state cases that invoke and apply *Ritchie*, held petitioner

4  had not met this standard:

5      Due process assures a criminal defendant "a right of access to evidence that is 'both
        favorable to the accused and material to guilt or punishment.'" *State v. Knutson*,
6      121 Wn.2d 766, 772, 854 P.2d 617 (1993) (quoting *Pennsylvania v. Ritchie*, 480
        U.S. 39, 57, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987)). But mental health counseling
7      records are privileged under RCW 5.60.060(9), [footnote omitted] requiring the
        court to balance the privacy interest in those records with the usefulness of the
8      evidence. *See* CrR 4.7(e); *State v. Kalakosky*, 121 Wn.2d 525, 547–48, 852 P.2d
        1064 (1993) (instructing that the Victims of Sexual Assault Act, chapter 70.125
9      RCW, "clearly requires that the defendant make some statement showing need for
        the counseling notes before the victim's right to privacy is overcome").
10
        "[T]o obtain in camera review of privileged records a defendant must establish that
11     the records are at least material." *State v. Diemel*, 81 Wn. App. 464, 468, 914 P.2d
        779 (1996); *see Ritchie*, 480 U.S. at 57; *Kalakosky*, 121 Wn.2d at [550]. This
12     involves a "'plausible showing'" that the evidence is both material and favorable.
        *State v. Gregory*, 158 Wn.2d 759, 791, 147 P.3d 1201 (2006) [footnote omitted]
13     (quoting *Ritchie*, 480 U.S. at 58 n.15), overruled in part on other grounds by *State
        v. W.R.*, 181 Wn.2d 757, 336 P.3d 1134 (2014). Evidence is material only if there
14     is a "reasonable probability" that it will impact the outcome of a trial. *Gregory*, 158
        Wn.2d at 791. "A reasonable probability is probability sufficient to undermine
15     confidence in the outcome." *Gregory*, 158 Wn.2d at 791. A defendant must show
        more than a mere possibility of materiality. *Knutson*, 121 Wn.2d at 773. "A claim
16     that privileged files might lead to other evidence or may contain information critical
        to the defense is not sufficient to compel a court to make an in camera inspection."
17     *Diemel*, 81 Wn. App. at 469.

18     . . . Here, the trial court's decision to deny in camera review of A.D.'s counseling
        records was within a range of acceptable choices.
19
        Schlosser claims that the "significance of A.D.'s work with Laura Franco is what
20     [A.D.] did not tell her: that she was repeatedly raped and molested by her
        stepfather." [Footnote omitted] But the record is clear that A.D. did not disclose the
21     rapes to anyone until October 2016 when A.D. told C.F. and J.B. She then told
        Jillian, Stephanie, and Dr. Wiester. A.D. admitted that at first, she disclosed only
22     the 2013 rape in the master bedroom to authorities. A.D. testified that she did not
        disclose the incident in the bathtub until a May 2017 interview with police. She also
23     admitted that she did not disclose the rape in her bedroom until an interview in
        February 2018. So counseling records from sessions in 2014 and 2015 showing that

24

A.D. did not disclose Schlosser repeatedly raped and molested her would have been of little value to his defense. Schlosser had ample evidence to argue his theory of the case and to impeach A.D. based on the timing and details of her disclosures. The trial court did not abuse its discretion in denying Schlosser's request for in camera review of A.D.'s counseling records. [footnote omitted].

Dkt. 10-1 at 25–28 (Ex. 2).

The state court of appeals did not unreasonably apply clearly established federal law. Here, petitioner sought the records in order to support his theory of the case that "this did not happen . . . and probabtive to that issue is whether or not [A.D.] told other people it had happened." Dkt. 10-1 at 683 (Ex. 15).  As the state court of appeals noted, petitioner argued the significance of the requested records was to establish A.D. did not tell her therapist she had been raped. Dkt. 10-1 at 27 (Ex. 2).

But, as the state court of appeals observed, the record was already replete with evidence A.D. had told *no one* she had been raped until *after* the 2014–15 time period covered by the requested records. *Id*. Indeed, A.D. herself admitted she did not tell anyone of the rapes until 2016. *See* Dkt. 10-1 at 1526–27 (Ex. 21) ("At any point before you have that conversation with Cole do you tell anybody what happened with you and David? No."). This categorical statement encompasses all of A.D.'s broad array of friends, family members and treatment providers (and thus would also appear to include her therapist). Indeed, the record contains overwhelming evidence A.D. concealed her rape and molestation claims until 2016—including falsely attributing a 2013 vaginal injury to a fall down the stairs during consultations with her mother and two separate physicians. *See, e.g.* Dkt. 10-1 at 1073 (Ex. 18), 1095 (Ex. 18), 1443 (Ex. 20), 1502 (Ex. 21). Further, the record demonstrates that even after disclosing one episode of rape in 2016, A.D. continued to withhold her claims regarding additional incidents and only revealed them incrementally between 2016 and 2018. Dkt. 10-1 at 1528–38 (Ex. 21). *See also* Dkt. 10-1 at 1145 (Ex. 18), 1326 (Ex. 19), 1455 (Ex.20).

1    In short, petitioner already had ample evidence that A.D. made no contemporaneous

2    disclosures to anyone during the time of the abuses, from which he could argue his theory that

3    A.D. manufactured her allegations years after the fact. Indeed, petitioner's closing argument

4    strongly made this point. Dkt. 10-1 at 1812–24 (Ex. 23). As any additional evidence that A.D.

5    had failed to disclose the assaults to any additional person would have been merely cumulative,

6    petitioner has not established a reasonable probability that, had the evidence been disclosed to

7    the defense, the result of the proceeding would have been different. *See, e.g., Davis v. Litscher*,

8    290 F.3d 943, 945 (7th Cir. 2002) (no error in declining in camera review of victim's mental

9    health records where any evidence of her drug addiction would be merely cumulative); *Dietrich*,

10   701 F.3d at 1197 (victim's therapy records were immaterial and cumulative where the record

11   already contained evidence of motive that petitioner sought to establish).

12   The state court of appeals reasonably applied *Richie* when it concluded the records would

13   have been of little value to petitioner's defense.  The Court therefore recommends Ground 1 be

14   denied.

15   3. *Exclusion of Evidence of Victim's Statements to Counselor (Ground 2)*

16   Petitioner next argues the trial court violated his constitutional right to confrontation by

17   prohibiting him from questioning A.D. about whether she informed her counselor that petitioner

18   had abused her. Dkt. 3 at 16. Respondent asserts the state courts' limitations reasonably apply

19   established federal law. Dkt. 9 at 23–26.

20   The "main and essential purpose of confrontation is *to secure for the opponent the*

21   *opportunity of cross-examination.*" *Delaware v. Van Arsdall,* 475 U.S. 673, 678 (1986) (internal

22   quotation marks omitted). "Cross-examination is the principal means by which the believability

23   of a witness and the truth of his testimony are tested [, allowing the cross-examiner] . . .  to delve

24   into the witness' story to test the witness' perceptions and memory . . . [and] to impeach, i.e.,

discredit, the witness." *Davis v. Alaska,* 415 U.S. 308, 316 (1974). But the Supreme Court has repeatedly emphasized that the right is limited to the guarantee of "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Van Arsdall,* 475 U.S. at 679 (internal quotation marks omitted). Accordingly, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id*.

Generally speaking, a court violates the Confrontation Clause only when it prevents a defendant from examining a particular and relevant topic, such as bias. "The Supreme Court consistently has held a Confrontation Clause violation occurs when a trial judge prohibits *any* inquiry into why a witness may be biased. However, when some inquiry is permitted, trial judges retain wide latitude to impose reasonable limits on such cross-examination. No Confrontation Clause violation occurs as long as the jury receives sufficient information to appraise the biases and motivations of the witness." *Hayes v. Ayers,* 632 F.3d 500, 518 (9th Cir. 2011) (internal quotation marks, citations, and ellipsis omitted). "Only rarely ha[s the Supreme Court] held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada v. Jackson*, 569 U.S. 505, 509 (2013).

The state court of appeals reasonably rejected petitioner's claim, because the limits on cross-examination were proper. The state court of appeals held:

.  .  .  Both the federal and state constitutions guarantee the right to confront and cross-examine adverse witnesses. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *Darden*, 145 Wn.2d at 620. But the right to cross-examination is not absolute. *Darden*, 145 Wn.2d at 620. "The confrontation right and associated cross-examination are limited by general considerations of relevance." *Darden*, 145 Wn.2d at 621. A trial court may reject lines of questions "that only remotely tend

1    to show bias or prejudice." *State v. Kilgore*, 107 Wn. App. 160, 185, 26 P.3d 308

2    (2001). The more important the witness is for the prosecution's case, the more
     latitude the defense should have to explore issues of motive, bias, and credibility.

3    *Darden*, 145 Wn.2d at 619.

4    Here, Schlosser sought to ask A.D., "[Y]ou did not tell anyone — you did not tell
     your counselor, Laura Franco, about this incident, did you." The trial court ruled

5    that Schlosser could not ask A.D. the question "based upon [the prior judge]'s
     ruling, which did not allow the disclosure of any of the conversations" between

6    A.D. and Franco.

7    Schlosser argues that the court should have permitted him to question A.D. about
     his suspicion that she failed to disclose the abuse to her counselor because "[u]nlike

8    individual doctors she saw years earlier, [A.D.] had a long-term relationship with
     this counselor" and was more likely to have disclosed to Franco if Schlosser

9    sexually assaulted her. But as already discussed, A.D. admitted that she did not
     disclose the rapes to anyone until 2016, which was well after the 2014 to 2015

10   period of counseling. A.D. testified that before 2016, she did not disclose the sexual
     assaults to her mother, other family members, doctors, friends, or anyone else

11   because she was "scared" Schlosser would hurt her worse than he had already, and
     she was "worried" about the effect it would have on "everybody in my house"

12   because Schlosser "would get in trouble." Even after A.D. disclosed the rapes to
     J.B. in October 2016, the evidence and testimony established that she insisted J.B.

13   "keep that a secret."

14   Eliciting testimony that A.D. did not tell Franco about the sexual abuse would have
     added little probative value when considered in the context that she did not disclose

15   the abuse to anyone. We cannot say that the trial court made its decision to exclude
     Schlosser's question on untenable grounds or for untenable reasons.

16   Dkt. 10-1 at 28–30 (Ex. 2).

17         As with A.D.'s counselling records, any additional cross-examination of A.D. focusing

18   on her failure to disclose she was assaulted would be wholly cumulative. The record already

19   amply demonstrated that A.D. made no disclosure to anyone—including her closest and most

20   trusted family members and friends—before 2016. *See* Dkt. 10-1 at 1526, 1527, 1073, 1095,

21   1443, 1502. The record shows the jury received abundant information from which petitioner

22   could have (and did) impeach A.D.'s testimony on the ground that she did not make any

23   contemporaneous disclosures of abuse. *See Hayes*, 632 F.3d at 518 ("Hayes's cross-examination

24   of Garcia gave the jury ample opportunity to appraise her biases and motivations.").

REPORT AND RECOMMENDATION - 16

1    The state court of appeals did not unreasonably apply clearly established federal law

2    when it denied petitioner's confrontation claim. The Court recommends Ground 2 be denied.

3        4. *Trial Court's Comments and Interruptions of Defense Counsel (Ground 4)*

4        Petitioner asserts the trial court repeatedly interrupted and rebuked his defense counsel,

5    and sustained objections without a stated basis—which deprived him of the effective assistance

6    of counsel. Dkt. 3 at 3. Respondent contends the state court's adjudication was not contrary to or

7    an unreasonable application of clearly established federal law. Dkt. 9 at 26–31.[2] The Court notes

8    it is questionable whether petitioner has even properly presented this claim as a matter of federal

9    law. Both parties briefed it before the state courts solely as a matter of state law, and the state

10   court of appeals likewise addressed only state law in its opinion. Dkt. 10-1 at 97–102 (Ex. 3);

11   Dkt. 10-1 at 166–174 (Ex. 4); Dkt. 10-1 at 217–220 (Ex. 5); Dkt. 10-1 at 35–39 (Ex. 2). The only

12   citation to federal law the Court has found in the state court record for this claim is a citation at

13   the conclusion of petitioner's direct appeal argument on this issue to "U.S. Const., amends. 6,

14   14" (Dkt. 10-1 at 102 (Ex. 3)). Petitioner does not discuss case law pertaining to this issue in his

15   petition or his traverse in this matter (*see* Dkts. 3, 23); the only discussion of federal law in the

16   record is contained in Respondent's Answer (Dkt. 9, p. 27) in this matter. However, in an

17   abundance of caution and as the parties have briefed this issue, the Court has reviewed it.

18       The trial court has the duty to conduct a jury trial "in a general atmosphere of

19   impartiality." *United States v. Cassiagnol,* 420 F.2d 868, 878 (4th Cir. 1970). Furthermore, the

20   court "must not create 'an appearance of partiality by continued intervention on the side of one

21

22   _____

23       [2] Neither the petition nor petitioner's reply identifies any specific statements or rulings by the trial court
     that are alleged to be improper. *See* Dkt. 3 at 19. The state court of appeals addressed several instances in its order;
     the Court here will confine its review to those identified instances. Notably, petitioner does not assert that any of the
24   trial court's evidentiary rulings were in error.

REPORT AND RECOMMENDATION - 17

of the parties or undermine[ ] the effective functioning of counsel through repeated interruption of the examination of witnesses.'" *United States v. Norris,* 873 F.2d 1519, 1526 (D.C.Cir. 1989) (quoting *United States v. Liddy,* 509 F.2d 428, 438–39 (D.C. Cir.1974). The court, however, must "exercise reasonable control over" the interrogation of witnesses and the presentation of evidence in order to ensure the effective determination of the truth, to avoid needless waste of time in the presentation of a case, and to circumvent undue witness intimidation and embarrassment. Fed. R. Evid. 611(a). Particularly in a complex case involving numerous witnesses, the district court has a crucial duty to ensure "'that the facts are properly developed and that their bearing upon the question at issue are clearly understood by the jury.'" *United States v. Seeright,* 978 F.2d 842, 847 (4th Cir. 1992) (quoting *Simon v. United States,* 123 F.2d 80, 83 (4th Cir. 1941).

On federal habeas review of a claim alleging judicial bias or misconduct, the issue is whether, viewed in the context of the trial as a whole, the judge's behavior rendered the trial so fundamentally unfair as to violate due process. *Duckett v. Godinez*, 67 F.3d 734, 740–41 (9th Cir. 1995). To succeed on such a claim on habeas review, there must be an "extremely high level of interference" by the trial judge creating a "pervasive climate of partiality and unfairness." *Id.* (citation and additional quotation marks omitted). A petitioner must "overcome a presumption of honesty and integrity in those serving as adjudicators[.]" *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). "In the absence of any evidence of some extrajudicial source of bias or partiality, neither adverse rulings nor impatient remarks are generally sufficient to overcome the presumption of judicial integrity, even if those remarks are 'critical or disapproving of, or even hostile to, counsel, the parties, or their cases.' " *Larson v. Palmateer*, 515 F.3d 1057, 1067 (9th Cir. 2008) (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)).

1    Here, the record demonstrates the state court of appeals reasonably determined the trial

2    court acted properly. The state court of appeals held:

3    > Here, Schlosser argues the trial court "denigrated" defense counsel, "repeatedly
     > demean[ed] counsel, interrupt[ed] his questions, cut him off even without an
4    > objection, and sustain[ed] objections without a basis being stated — then
     > criticize[d] counsel for asking for a basis." For instance, he points to the following
5    > exchange during defense counsel's opening statement:

6    > > Two years went by from the time of that 2016 until you
     > > know, here we are today. And during that time [A.D.]'s story
7    > > changed. [A.D.]'s story was enhanced. ...

8    > > And as the story changes, as the story evolves, in February
     > > of this year, of 2018, [A.D.] approaches ... the prosecutor, and has
9    > > a meeting with him and says oh, you know what? There's
     > > something else that happened. And then she describes the thing —
10   > > the — the other thing that happened. She says you know that —
     > > that vaginal injury that I had when I fell down the stairs? That
11   > > didn't really happen. She will tell you — she will come into this
     > > courtroom and she will tell you, I lied about it to Doctor —

12
     > > > [PROSECUTOR]: Objection, argumentative.
13   > > > THE COURT: It is argumentative.
     > > > [DEFENSE COUNSEL]: She —
14   > > > THE COURT: Counsel, you've got to —
     > > > [DEFENSE COUNSEL]: It's the State's —
15   > > > THE COURT: — be careful.
     > > > [DEFENSE COUNSEL]: It's the evidence, Your Honor. The State
16   > > > — this is what she's going to say. She says she lied.
     > > > THE COURT: The objection is sustained. Please —
17   > > > [DEFENSE COUNSEL]: All right. I'll move on.
     > > > THE COURT: — *stay with the facts*. Yes.

18
     > Schlosser points to the emphasized language as the court being critical of  his
19   > attorney. We disagree. The record shows that the court was exercising reasonable
     > control over the evidence by instructing counsel not to argue his case to the jury
20   > during opening remarks. [footnote omitted.]

21   > Schlosser also complains that while he was testifying and his attorney was about to
     > show him a recently marked exhibit, the court interrupted by instructing his attorney
22   > to "[s]how it to [opposing] counsel." His attorney told the court that he had done
     > so. The court responded, "All right. Thank you." While the record does not reflect
23   > when Schlosser's attorney showed the prosecutor the exhibit or whether the court
     > witnessed him do so, this exchange suggests the court did not see it occur. Schlosser

24

again fails to show how the trial court's effort to exercise control over the orderly presentation of evidence impugned his attorney.

Finally, Schlosser claims the court disparaged his attorney during crossexamination of Stephanie when the court interrupted without an objection by the State:

> Q. Okay. Was 2013 the worst year of your life?
> A. I would say that the years I lived in [the three-level house in Issaquah] with [Schlosser] were the worst years of my life.
> Q. Okay. Well —
> A. Some of them.
> Q. The specific reason that 2013 was a bad year was because you had been — let me rephrase that. Isn't it true that —
>
> THE COURT: Didn't I just rule on this, counsel? Or is there something that — that I don't —
> [DEFENSE COUNSEL]: I'm sorry?
> THE COURT: Didn't I just rule on this, counsel? Or is there something else that I don't —
> [DEFENSE COUNSEL]: I think you did, but I'm just trying to make sure I'm consistent with your ruling, your Honor.
> THE COURT: You can't address the topic.
> [DEFENSE COUNSEL]: May we have a conference?
>
> THE COURT: We just discussed this. Unless it's something new you have. If there's something new, yes. But if there is not, I ruled you and [the prosecutor]. But I'm happy to hear more if there's more.
> [DEFENSE COUNSEL]: Well, I'm really at fault by this, your Honor. I just want to be clear that I'm consistent with the ruling. Just a side bar.
> THE COURT: All right.
> [DEFENSE COUNSEL]: Thank you.
> THE COURT: All right.

The parties then discussed the issue at sidebar. [court's footnote. Five pages earlier in the transcript, Schlosser wanted to question Stephanie on crossexamination about her drug usage during 2013. The court disallowed the inquiry unless Schlosser could establish "some kind of a nexus."]

Schlosser's complaint again lacks merit. The court's comment did not disparage Schlosser's attorney. Instead, the court interrupted Schlosser's attorney to prevent Schlosser from violating a prior ruling.

1

2

3          While Schlosser's attorney clearly perceived some of the court's conduct to be too
           critical and denigrating, the record shows that the court properly managed the
           proceedings in a manner fair to both parties. For example, the trial court acted on
4          defense counsel's general objections, interrupted both parties to prevent witnesses
           and counsel from talking over each other, instructed the prosecutor to "slow down"
           while examining witnesses, and granted both the prosecutor's and defense
5          counsel's requests for breaks.

6          The trial court's comments did not deprive Schlosser of effective assistance of
           counsel because they were an exercise of the court's authority to control the orderly
7          presentation of evidence and argument in the courtroom. And to the extent that the
           jury perceived the court's comments as directed toward Schlosser's attorney,
           Schlosser fails to show any prejudice. Schlosser's attorney vigorously defended
8          him, attacked A.D.'s credibility, and his advocacy successfully defeated two of the
           State's three charges.

9    Dkt. 10-1 at 35–39 (Ex. 2).

10

11         Petitioner contends the state court judge's comments and interruptions of counsel were

12   improper and deprived petitioner of the effective assistance of counsel. The state court of

13   appeals thoroughly reviewed each of the incidents raised by petitioner, and reasonably concluded

14   that there is no indication of prejudice. The Court has reviewed each of the identified incidents,

15   and finds that petitioner has not shown the state court exceeded the appropriate bounds of a trial

16   court exercising control over the orderly presentation of evidence to the jury. None of the three

17   instances addressed by the state court of appeals rises to the required level of an "extremely high

18   level of interference" by the trial judge creating a "pervasive climate of partiality and

19   unfairness." *Duckett*, 67 F.3d at 740. Furthermore, as the state court of appeals held, the record

20   as a whole demonstrates the trial court's interventions were even-handed and addressed both

21   sides. *See*, *e.g.* Dkt. 10-1 at 1571 (Ex 21) (denying Prosecution request) *Id*. at 1734 (Ex. 22)

22   (admonishing Prosecution's counsel to "slow down") *Id*. at 1737 (Ex. 22) (sustaining defense

23   counsel's objection and offering a break during defendant's testimony); *Id*. at 1084 (Ex. 23)

24   (court responds to Prosecution's objection with "I think [defense counsel] may be correct"). The

1  Court finds no comment or statement by the trial court that could rise to the level of prejudice

2  necessary to support habeas relief.

3       The state court of appeals reasonably adjudicated petitioner's claim. The Court

4  recommends that Ground 4 denied.

5  **III.    Evidentiary Hearing**

6       The decision to hold an evidentiary hearing is committed to the Court's discretion.

7  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a

8  hearing could enable an applicant to prove the petition's factual allegations, which, if true, would

9  entitle the applicant to federal habeas relief." *Id.* at 474. In determining whether relief is

10 available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before the

11 state court. *Pinholster*, 563 U.S. at 181–82. A hearing is not required if the allegations would not

12 entitle petitioner to relief under §2254(d). *Landrigan*, 550 U.S. at 474. "It follows that if the

13 record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district

14 court is not required to hold an evidentiary hearing." *Id*. The Court finds it is not necessary to

15 hold an evidentiary hearing in this case because, as discussed in this Report and

16 Recommendation, petitioner's grounds may be resolved on the existing state court record.

17 **IV.    Certificate of Appealability**

18      A petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district

19 court's dismissal of the federal habeas petition only after obtaining a certificate of appealability

20 (COA) from a district or circuit judge. *See* 28 U.S.C. § 2253(c). "A certificate of appealability

21 may issue . . . only if the [petitioner] has made a substantial showing of the denial of a

22 constitutional right." 28 U.S.C. § 2253(c)(2). Petitioner satisfies this standard "by demonstrating

23 that jurists of reason could disagree with the district court's resolution of his constitutional

24 claims or that jurists could conclude the issues presented are adequate to deserve encouragement

1  to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*,

2  529 U.S. 473, 484 (2000)).

3         No jurist of reason could disagree with this Court's evaluation of petitioner's claims or

4  would conclude the issues presented in the Amended Petition should proceed further. Therefore,

5  the Court concludes petitioner is not entitled to a certificate of appealability with respect to this

6  case.

7  **V.    Conclusion**

8         For the above stated reasons, the Court concludes petitioner's motion to withdraw

9  Grounds 3, 5 and 6 should be granted, and the state court's adjudication of Grounds 1, 2 and 4

10  was not contrary to, nor an unreasonable application of clearly established federal law. The Court

11  finds an evidentiary hearing is not necessary. Therefore, the Court recommends Grounds 3, 5 and

12  6 be dismissed, Grounds 1, 2 and 4 be denied, and a certificate of appealability not be issued.

13         Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

14  fourteen (14) days from service of this report to file written objections. *See also* Fed. R. Civ. P.

15  6. Failure to file objections will result in a waiver of those objections for purposes of *de novo*

16  review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those

17  objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v.*

18  *Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit

19  imposed by Fed. R. Civ. P. 72(b), the Clerk is directed to set the matter for consideration on June

20  2, 2023, as noted in the caption.

21         Dated this 18th day of May, 2023.

22

23         _____
                     David W. Christel
24                   United States Magistrate Judge